Good afternoon. I'm Randall Dunn, and I'm the counsel for the appellant, Mr. Kearby. This case involves Mr. Kearby's appeal of his 235-month sentence following a guilty plea conviction for conspiracy in possession with intent to distribute methamphetamine. This afternoon I will address the first four issues in our brief in my remarks and rest on the brief for issues 5 and 6. The offense level in this case that he was sentenced was level 31, criminal history level of 6, for a range of 188 to 235-month sentences. He received a 235-month sentence from the district court. Based on our argument, we believe that the sentence should probably be two levels lower base offense level of level 29, a range of 151 to 188 months. It's a 47-month difference between those if you take the upper levels and subtract that. The first issue that we dealt with, actually 1 and 2, are somewhat related and overlap from time to time. Issue 1 has to do with the multiplier method in calculating drug quantity. We believe that that was determined on unreliable evidence. The multiplier method that we're referring to is simply taking quantities, known quantities of a drug, and then looking at the numbers of occurrences and multiplying those and coming up with a total drug quantity calculation. That issue was not objected to in the district court, is that right? That's right, that's correct. So that would be plain error review? Well, the multiplier method was objected to. There were objections to the pre-sentence report that were filed by the attorney representing Mr. Kirby, and they did raise the objections to the drug quantity calculation. That should be there. So that issue I don't think would be plain error because it was preserved. The judge took a lower estimate, right? In other words, rather than three ounces per day, he took one ounce per day? Yes, one to three ounces per day for 60 days was the way it was calculated. Yes, sir, but I mean he took the lower amount, did he not, a more conservative total? Oh, yes. Between the one and the three, he did take the lower amount. My experience has often been that I think that happens a lot, and I think it's probably good for defendants, and I think it's a fair way to approach it, but, yes, he did. They took the lower. Now, whether that was the recommendation of the case agent, I suspect it might have been in that case, but, yes, that's correct. It was one times 60 days. How do we overlook Ms. Herrera's statements that she and he sold one to three ounces every day for two months? How do I square that? She said that affirmatively. How do we overlook that? I don't see how we can say the district court erred in a fact finding with that testimony. Well, because I think there was some other evidence that I think overrides that and makes those statements look very questionable, and that was also before the district court, and that had to do with the fact that the witness was a co-conspirator in the case and also was involved in another case, and they probably already had a conviction for another related case. What's your best case that says we can ignore that evidence and override the district court's fact finding? We can ignore which evidence you speak of. Her statements, Ms. Herrera's statements. Well, I don't think, I'm not saying we necessarily ignore them. I think we look at them. We consider all the evidence, but in connection with that, it turned out that the evidence of the number of days, 60 days, was in conflict because what happened was the record I think is pretty clear that Mr. Kirby was involved for a two-month period, supposedly May and June of 2016. It turned out when we look at the record that the 60 days is not really 60 days. Well, that's based on the cell phone data, some of which is missing, but we also have an affirmative statement from Ms. Herrera which would support the district court's finding. It seems to me as long as there is evidence in the record to support the district court, we can't reweigh it. Well, but there was conflicting evidence. And that's what the district court's job is, is to sift through the conflicting evidence. As an appellate court, what gives us the authority to sift a different way? Well, there was destruction of evidence, which I think is quite serious in this case, and it was admitted by the case agent. In fact, the case agent is the one who at sentencing hearing testified. He testified at some length, and he said, yes, she destroyed all of the evidence in the cell phone. And he also said that that evidence on her cell phone was the only corroborating evidence that existed. He asked Mr. Kirby whether he did or he did not. That's where it was. He said, we have no other evidence. It was all destroyed. So you have someone who comes in and says there were 60 days, every day, one to three ounces for those 60 days. That's a quantity. And then it turns out that that information becomes suspect when you look at her reliability in connection with what she says. And I think that that's appropriate to look at that reliability. What happened to Mr. Kirby's cell phone records? I don't know that they were even brought up. Well, he's got the burden of proof. I mean, he has the opportunity to test her reliability and test her statements that he offered, his own phone records, to say we only texted for 30 days, not 60 days. Well, Mr. Kirby also talked to the case agent, the same case agent who testified. He was asked at sentencing about that. And he said, yes, Mr. Kirby came up with a different estimate. His estimate was lower. I think it was between 30 to 45 months that Kirby said. And he was asked, do you find that Mr. Kirby was honest and forthcoming? You're talking about she destroyed phone records. He should have had mirror image phone records when they were texting back and forth, or at least something happened. What happened to his phone records is my question. There were actually phone records in the record. I think in the sentencing hearing there was a discussion. I'm sorry, not the sentencing hearing. It was in the objections to the pre-sentence report followed by the defendant that there were out of, I think, Mr. Finney, who was a case agent, said there were approximately 10,000 to 15,000 text messages. There were just lots of them. And he said that out of those, there were four or five that related to Mr. Kirby. So that kind of gives an indication that the frequency of Mr. Kirby, four or five text messages out of 10,000 to 15,000, looks strange when you look at that. And Mr. Finney, who testified to that, was asked a couple of times, I think, about the credibility of Mr. Kirby, and he said yes. He said I think he was honest and he was forthcoming. He said that was a figure he gave you, and he kind of hemmed and hawed around it first. He said I won't dispute that. He said it was probably something like that, the figure that he gave it. So when – if this was a case of spoliation of evidence, I think the general rule is that if you say any testimony related to that, if someone has destroyed spoliated evidence, should not be allowed in. I think in this case, if you look at that, the reliability of the person who did that, this was a person who was a co-conspirator, who was, if you will, an informant for the government. She had helped bring a lot of their cases, and so she was a very significant witness, and she was sponsored by the government, if you will. The case agent admitted that it was his fault, I guess you would say, that this cell phone was given to her after her interview, her interview at the Parker County Jail with the law enforcement people. And she wiped it clean just quickly, destroyed everything that was on there, and he gave her that. So on the one hand, this is a little bit different than some spoliation cases, which say you have to have some bad conduct, something like that, to go along with the destruction of evidence. And I think here you have bad conduct by this witness, by this co-conspirator. And it also – they also said Mr. Finney, in the testimony at the sentencing hearing, said that she was doing this because she wanted to protect herself, I guess, after she was convicted and found guilty. She had been tried in trial, I think October or November, found guilty. She said after that point, after that point, she decided that she needed to cooperate and provide information to the government. So you have someone who initially they apparently didn't feel was very trustworthy and reliable, but got reliable after she was convicted because now she wanted to help herself. So you have a combination of two people, I think, here, both on the government side, if you will. Mr. Finney, the case agent, who makes a mistake, I would say, an error in judgment in giving her this cell phone, and she just wipes everything off of it, which is those two months, May and June. It's not all of May. I think it didn't start until May the 22nd. But it was what was left of May and June because that was her then current phone. He said everything related to Mr. Kirby at the sentencing hearing, he said everything related to Mr. Kirby was in that cell phone. She wiped it out. So you have the government on one hand. Let's say they're negligent in letting that happen. They have some obligation, I think, to try and protect the evidence, maybe like under the Youngblood case. But she wiped it clean. She had an intentional decision to do that, so that was an intentional thing on her part. So you've got to say that's bad conduct on her part. Now she's not a government employee, but she's somewhat of an informant, very important witness in this case, especially for Kirby, but for other people as well. So I think given that, if you said, well, this is really like spoliation, it's not exactly – it's a hybrid. It's not exactly you have the government engaging in bad conduct and destroying evidence, but you have the government engaging in negligent conduct, which allows the evidence to be destroyed, and the person who did it is an informant, a very important informant for them, a co-conspirator in the case, and she did intend to do it. And Finney, I think, later said something to the effect in the sentencing hearing that the reason she wiped it out was because that was the most recent records for that period of time. And I think she may have been somewhat concerned about what that might reflect on her value to the government and the information she was providing. So we would say, with respect to that, that that testimony of hers is very suspect in I think one of two things. Either it should not be considered at all, would be my view, which would leave you with I guess you would say zero drug quantity for Mr. Kirby if that evidence was taken out. She was the only one that said anything. I thought he pled guilty. Yeah, he did. Well, I don't think you can go to zero when he pleads guilty. Well, I don't think you could either. I don't imagine that the district judge could accept a plea if they didn't have some comment. And Mr. Kirby didn't deny that he was involved. I thought he admitted at least one ounce a day. And I thought you already had how many days. I mean, he did say one ounce a day. It's just a question of how many days. I think he said I think he did say one ounce a day. But I think when he said one ounce a day, he was not saying 60 days. He was saying 37, 39 days, depending on how you look at the record. It's close. That's not zero. Well, I think the difference is if Kirby's view and the quantity was the right quantity or close to it, he would have been a break point lower in his base offense level. Now, that adds up to 47 months because he was, I think, at level 32. We would say he should be at level 30. So either way you approach it, you can either take Kirby's – what he said he thought the quantity was, and he admitted he wasn't denying he was involved. If you take his quantity, you would end up – that quantity still happens, and it ends up at 30, offense level 30. Or if you say, okay, we should do what some courts have done, other circuits, and say when we have one of these cases with this issue on drug quantity calculation, you should discount it or you should go back a level lower than what the level was. Either one of those, in this case, would come out the same place, level 30. What about Judge McBride's statement on the record that regardless of how the guidelines were calculated, and if he ruled – even if he ruled in your client's favor on all the issues that were – of the objections, he said I would pick the same sentence anyway given this defendant's criminal history? Well, oh, the harmless error issue that you're speaking of in the reply brief? Well, I think there are several answers to that. The – when he said same sentence regardless, there's an ambiguity, I think, at the least, and maybe it's more than an ambiguity. When the judge said – he said this is a sentence that needs to be imposed under the kind of policies, apparently he said, in order to meet the statutory requirements. When I read that, that looks to me like – I mean you can place different interpretations probably on that, but it looks to me like that he's saying the sentence that I oppose needs to be imposed in order to meet the statutory requirements. Well, what is that? That sounds sort of like a mandatory application of this sentence. And so if he's saying that even if I made a mistake in calculating the guideline range, I would impose the same sentence, then I would say that's an alternative sentence, and he should have some explanation for the alternative sentence. And then the confusion sort of mounted because the statement of reasons in the case said nothing about the same sentence regardless. If you look at the last paragraph in the statement of reasons, he said nothing about that. So that creates, I think, at least an ambiguity. What did he mean? Because there's a difference between the oral pronouncement and the statement of reasons. I understand that in this circuit the oral pronouncement controls, but nevertheless it still leaves it up in the air. Well, what did he mean by the statement that this is what needs to be imposed in order to meet the statutory requirements? That's a very interesting question about whether the statement of reasons has to illuminate that a judge said he'd impose the same sentence if he were reversed on the first sentence. Do you know any law that requires that for the statement of reasons to say if I am reversed on appeal for this sentence, I would alternately apply it as an enhancement, as a variance? No, I don't know any, but I know there's some Fifth Circuit, I think it's an unpublished decision, Miller decision, that sort of seems to say that if you have an ambiguity like this, that you have a problem, you have to go back and look at the whole record and try and determine what the judge's intent was in that case. I don't know of any requirement otherwise. I've seen, in my experience, a number of times when judges do say in court that this is the same sentence I would impose regardless, they'll also put it in the statement of record, but he didn't, and I don't think there's a requirement, but I think in this, when you read the statements that he did make and then you see the absence of it, I think what it does is it further creates ambiguity. What did he really mean? You've saved some time for rebuttal. Yes. Two minutes, Your Honor. Thank you. Good afternoon. May it please the Court. Amber Grand for the government. Ms. Grand, as I read your brief, you disagree that the multiplier method was even used here. Is that right, or am I misreading your position? That's correct, and the record at page 256 to 258 contains that objection. The only objection raised is that Mr. Kirby takes issue with the reliability of the witness. No, I wasn't talking about whether it was objected to. I read your brief as saying that you don't think Judge McBride even used the multiplier method. That's correct as well. Here we don't have some seizure of drugs on one occasion that's extrapolated to a number of other occasions. Here we have a known quantity of drugs, a daily occurrence for a known period of time. Simply because multiplication is involved doesn't mean the multiplier method is involved. The Cabrera case cited by the appellant uses examples of drug cases where a seizure occurred once and it's applied to 12 transactions over an extended conspiracy, and the Fifth Circuit said that's not sufficiently reliable, but we don't have that here. Here we have direct testimony by his source of supply who was party to those transactions, verifying that they occurred in one to three ounce quantities every day over a two-month time period. There's no multiplier method in play. Even if we boil down to a fact question about whether there was sufficient evidence of the drug quantity, Lopez would tell us that on plain air we don't even go there. That was ultimately, as Your Honor pointed out, a fact question that we shouldn't disturb because the district court is having to weigh that evidence in the first place and make that determination at sentencing. This case is nothing but a disagreement with the district court's judgment call. The court sees these types of challenges all the time, and his claims fail for three reasons. The PSR has ample evidentiary basis as well as sufficient indicia of reliability. At no time has the appellant rebutted those facts beyond bare objections pertaining to one source of that information. And finally, these types of credibility determinations are afforded great deference by the court on appeal. As a result, we would ask the court to decline Kirby's invitation to reweigh the facts in his favor and instead affirm the sentence in all respects. The record at page 201 shows that the PSR here was based on investigative reports from a laundry list of federal agencies. This was an extensive investigation. On top of that, the probation officer interviewed three different task force agents that were involved and used those interviews to corroborate the information from the investigative reports. And then the addendum clarifies that the third source of information were the proffer statements offered by Ms. Herrera in this case. Time and time again, this court has affirmed those types of sources as having adequate evidentiary value. Recently in United States v. RICO, we had a sentence enhancement at issue. The defendant claimed, you can't rely on those statements. Those are co-conspirators. They have an interest in making those statements. That's unreliable. And this court said, look, you have an adequate PSR. You have interviews with the agent. That's sufficient even in light of the potential self-interest involved with a co-defendant testifying. So the basis, the evidentiary basis here is not in question. The rebuttal of that information never took place either. We don't have any evidence offered by Mr. Kirby to rebut the facts, the proffer statements of Ms. Herrera. We don't have testimony from his customers about the quantity or the frequency of those transactions. He alleges that he sold the methamphetamine to support his own habit. We don't have any evidence about what that intravenous quantity was or what it would take from a sales standpoint to support that habit. We don't have his cell phone records corroborating the frequency of those transactions. He didn't testify at the sentencing hearing, and he simply made an objection to the reliability of Ms. Herrera and rested on that to rebut the facts. But this court has made clear in United States v. NAVA and others that simply claiming a source is unreliable doesn't affirmatively rebut the facts that are in the PSR. Had Ms. Herrera been sentenced at the time that she provided this information in Kirby's case? She had not. She was convicted, I believe it was in October, proffered in November, and it's not on the record, but I want to say her sentencing was in December. Approximately what was her sentence? She received a 300-month sentence in this case. On the credibility issue or on any of the fact findings, as I understand it, our test at sentencing is only whether the district court's decision was plausible in light of the record of the court. Yes, Your Honor. If there are two permissible views of the evidence, it can't be error at sentencing. That's absolutely correct. And for drug quantity, that's a determination that simply has to be a reasonable approximation. You need a preponderance of the evidence to show a reasonable approximation of the drug quantity. This is not an exact calculation that requires a text message by text message corroboration of the drug amounts. There is no authority in this circuit to support that burden of proof. And that burden lies with Mr. Kirby. As soon as the PSR has sufficient indicia of reliability, the onus is on him to put evidence into the record at sentencing to disprove and to show that those facts are materially unreliable or materially untrue. Once he fails to meet that burden, the district court can adopt the PSR without further inquiry. Here we go even a step better. Agent Finney testified at sentencing as to not only the cell phone issue but to the credibility and reliability of Herrera. The district court specifically questioned the agent and said, I know we have this issue. She wiped her phone after she was arrested. That's months before she decided to cooperate. But once she did decide to cooperate, did you find her to be credible? Was she reliable? And without hesitation, Agent Finney said, absolutely. We corroborated her information on Facebook and she had multiple cell phones. So in other text messages, we used her information to arrest and prosecute 15 to 20 different co-defendants in that case. As soon as she started cooperating, we found her evidence to be incredibly valuable. And I don't question it in any regard. So Judge McBride at that point can assess the credibility of Herrera through the agent's testimony at sentencing. And it's entirely his judgment call as to which version of events is the more credible version of events. And this court has time and time again declined to insert itself into that determination on appeal. Can we talk a minute about the knowledge of the importation of the meth from Mexico? Are there any Supreme Court cases recently that give you some pause about our precedent? There are not. That issue, and I would just note that the reply brief indicates that the issue of whether the methamphetamine was imported in the first place is in play. It's not. Two different times in the district court, he admitted that the methamphetamine, that the record showed that it had actually been imported. There's no evidence that Kirby knew it was imported or that Kirby knew the ingredients were imported. The ingredients, that was in the statement in the PSR. The importation of the methamphetamine, he does admit in his objections to the PSR that, I guess he phrases it as though the evidence shows that it was imported. The knowledge component, though. His knowledge. Correct. There's no evidence that he knew it was imported, is there? Right. There's no. But this court has found no sign to a requirement with that enhancement. That issue is foreclosed by this court's precedent and folks and surface. There's nothing in the record. This was imported from that county or whatever it is in southern Mexico, I presume, right? Pablo Morales, I believe, was the source that was importing. The PSR reflected was the source. We had a big, I think it was a money laundering appeal a few months ago where it said that there was one particular place in Michoacan or one of the states of Mexico that was doing all the meth now. So I'm assuming if I know this from sitting on one case on the Court of Appeals that the drug dealers who were dealing a pound a month probably have some idea about that. Well, and the record I don't think reflects the location of where the importation came from, but this was not a one-off transaction. These were daily transactions. Yeah, this is three or four pounds. That's quite a lot. And I would emphasize to the court that this was a very conservative estimate. The record at page 44 has the factual resume in which Kirby admits to, quote, multi-ounce transactions with Herrera, which he then turned around and redistributed. Herrera's statements indicated between one and three ounces were transacted daily. So even if we take an average of those numbers and you take two ounces of methamphetamine and you use the timeframe that he offers, the 40-day timeframe, you're at 2.2 kilos of methamphetamine. You're still at an offense level 32. So the district court actually gave him a huge benefit of the doubt in using the one-ounce quantity when, in fact, he had admitted to multi-ounce transactions with Herrera. So there really can't be any question on this record that this was a reasonable approximation of the drug quantity based on the completely unrebutted evidence in the PSR. I would point the court to United States v. Rogers as just one example where the district court made a credibility determination on facts that are notably different from these. In Rogers, we had a series of confidential informants that were used to establish drug quantity. In that case, the defendant was able to affirmatively demonstrate that portions of that drug quantity could not be true because she was incarcerated at the time of those transactions. And this court explained that even though that evidence had been affirmatively disproved in part because there was corroboration of other aspects of the conspiracy and because that didn't directly rebut the drug quantity, it was still proper for the district court to, based on agent testimony of that sentencing, to find those estimations to be reliable and to affirm the drug quantity determination in that case. We don't even get close to that here. We don't have any evidence that Mr. Kirby was imprisoned during the 60 days at issue or that he was out of town or not participating for some reason. We have no direct rebuttal of the quantity. He simply challenges the approximation. And this court's precedent makes clear that it won't insert itself into a credibility determination of that sort. Unless the court has additional questions on this issue or the other issues raised by Mr. Kirby, the government would briefly note that a number of issues are raised for the first time in his reply brief. Those issues are plainly waived in this appeal. And as a result, the government will cede its time and rely on its brief in asking the court to affirm the sentence in all respects. Thank you. I just have one quick issue, which I think should be addressed with respect to Kirby's knowledge of the importation of methamphetamine. And that is something I think that we raised in our brief, but I don't think it's really been dealt with completely. And that is the application of that enhancement without a showing of mens rea, a guilty knowledge, I think conflicts with the requirements of 1B, 1.2B of the sentencing guidelines. The 1B, 1.3 requires in case of jointly undertaking criminal activity consideration of all acts of others that were within the scope of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity that occurred during the commission of the offense of conviction. The commentary to that specifically states accountability of the defendant for the acts of others is limited by the scope of his or her agreement to undertake the particular criminal activity. So there's still a requirement, we believe, that the offense involved the importation of methamphetamine. So in determining whether the offense involved the importation, it's still necessary to determine, I think, whether Kirby's conduct for purposes of application of that importation enhancement meets the requirements of that section. And if the scope of Kirby's jointly undertaking criminal activity did not include importation, which it didn't, then applying the enhancement is error because it's untethered from any knowledge Kirby had or any conduct that Kirby had. And to say that the enhancement is a strict liability enhancement just simply flies in the face of Section 1B, 1.3, I think, of the sentencing guidelines. So I think that's an issue that really hasn't been explored enough in this case because our view is Mr. Kirby had no such knowledge. Thank you. Thank you, counsel. We have your argument. Thank you.